UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SOKLAY PEN,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security<br><br>        Defendant. | Case No. 12-cv-01041 NC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND TO THE SOCIAL SECURITY ADMINISTRATION**<br><br>Re: Dkt. Nos. 17, 18 |

      Plaintiff Soklay Pen seeks judicial review of the Commissioner of Social Security's final decision denying her claim for disability insurance benefits and Supplemental Security Income ("SSI") as a person disabled and unable to engage in substantial gainful activity. Both parties move for summary judgment. The issues are (1) whether the ALJ properly weighed the medical opinions, (2) whether the ALJ properly discredited Pen's testimony, and (3) whether substantial evidence supports the ALJ's assessment of her residual functional capacity. Because the ALJ committed legal error in weighing the opinion of one of the medical sources, the Court REVERSES the ALJ's determination and REMANDS for the Commissioner to determine whether, after according proper weight to the treating physicians and supplementing the record, Pen may perform jobs existing in significant numbers in the national economy.

# I. BACKGROUND

## A. Agency Review

On May 17, 2007, Pen applied for SSI benefits on the basis that she was disabled and unable to work beginning on April 17, 2007, due to mental anxiety, depression, and hearing voices. (AR 126-142, 59.) The Social Security Administration ("SSA") denied Pen's request for SSI benefits on November 2, 2007. (AR 59-63.) Based on reports from the Alta Bates Medical Center and the Social Security interviewer, Morey Weingarten, the SSA found that Pen's condition was not severe enough to be considered disabling. (AR 59.) It noted specifically that Pen attended her "10/25/07 appointment but [was] completely unresponsive during the exam. Therefore the psychiatrist was unable to gather adequate information about [her] condition." (AR 59.) As a result, the SSA could not "determine whether [her] condition limits [her] ability to work." (AR 59.)

Pen requested that her claim be reconsidered on January 10, 2008. (AR 67.) On May 30, 2008, after considering new reports from Maria Kerosky, Ph.D., and the Shuman-Liles Clinic,[1] the SSA upheld its initial decision to deny benefits because the "statements about [Pen's] condition and how it limits [her] ability to perform work related instructions are not fully supported by the evidence in file." (AR 69.) The SSA concluded that Pen could return to similar types of past relevant work as her job as a cashier. (AR 69.)

## B. Administrative Review

On July 7, 2008, Pen sought administrative review of the SSA's decision. (AR 76.) At a hearing before Administrative Law Judge Timothy Stueve on February 17, 2010, Pen testified about her mental health and how it affected her ability to work. (AR 24-47.) Vocational expert Jeff Beeman also testified. (AR 48-52.)

---

[1] The SSA's denial of benefits states that it also considered a report from Parvin Afary, Ph.D. (AR 69.) But, the only medical records from Dr. Afary in the administrative record are dated February 2010. (AR 387.) The record contains two references to Dr. Afary prior to 2010: a letter sent from Pen's representative at Bay Area Legal Aid to the Department of Social Services, stating that "Dr. Mona Afary" is a medical source in support of Pen's application for disability (AR 320), and a form sent on April 29, 2008 to "Parvin Mona Afary" at the Center for Empowering Refugee and Immigrants from the Department of Social Services requesting medical records (AR 288-89).

Case No. 12-cv-01041 NC
ORDER GRANTING REMAND        2

**1. Pen's testimony at the February 17, 2010 hearing**

Pen was born in Cambodia on March 3, 1972. (AR 28, 185.) She lost many relatives during the reign of the Khmer Rouge. (AR 40-41.) She once witnessed a crying, bleeding child sitting next to the dead body of its mother. (AR 40-41.) When she was a baby, a fragment of shrapnel from a mine flew into Pen's ear. (AR 41.) Pen left Cambodia when she was about nine years old and lived in a refugee camp in Thailand before coming to the United States. (AR 60.) Upon arriving in the United States, Pen attended school until tenth grade but failed many classes. (AR 29, 42-43.) Beginning in 1998, Pen worked selling coffee. (AR 31.) At her job, she communicated in English but had memorized the menu. (AR 32.) Later, she worked as a home health aide, communicating in Cambodian. (AR 32.)

Pen testified that her nervousness prevents her from working at a coffee shop. (AR 39.) She said her health got worse around 2003 and 2004 because she was more nervous and more scared. (AR 44.) She went a week without sleeping because she was hearing voices. (AR 44.) Her symptoms include headaches, auditory hallucinations, sleep disturbances, delusions, anxiety, and depression. (AR 33-38, 229-236, 251-252, 290, 308-319, 333-338, 374-375, 386-434.)

Pen also testified that she had an alcohol problem but quit drinking in 2009. (AR 38.) She takes prescription medication for depression, and sees Dr. Steve Boland once a month, although the record does not include these visits. (AR 34.) She feels worried, anxious, and nervous often, and remembers when she was young during the Khmer Rouge in Cambodia. (AR 35.) A CT scan in 2006 confirmed that the shrapnel piece was still lodged in Pen's inner ear, although the scan incorrectly identified the metallic object as an aneurysm clip. (AR 377.) She has headaches on a daily basis and takes over the counter Tylenol to treat them. (AR 33.) When Pen was working as a coffee server, she took breaks for headaches, but never asked for a day off work. (AR 42.)

She is not comfortable with strangers, but she sometimes visits her siblings (AR 36.) Pen cooks for her four children, and sometimes her sister drops off food. (AR 37.) On a

Case No. 12-cv-01041 NC
ORDER GRANTING REMAND      3

typical day, she wakes up, prepares her children for school, makes food for lunch, and takes them to school. (AR 37.) She drives them to school when she is feeling good, but she only drives short distances. (AR 38.)

### 2. The vocational expert's testimony at the February 17, 2010 hearing

A vocational expert, Jeff Beeman, also testified at the hearing. (AR 48-53.) Beeman characterized Pen's prior work as food service worker as medium, unskilled work. (AR 48.) The ALJ asked Beeman to consider whether a person of the claimant's age, education, and work experience who was able to work at all exertional levels, but was limited to simple, routine, and repetitive tasks with few work place changes would be able to work as a food service worker. (AR 48.) Beeman testified that the hypothetical individual would be able to do Pen's past work as a food service worker. (AR 49.) Taking into account Pen's linguistic barriers, Beeman testified that she would be able to do about fifty percent of unskilled work in the national economy. (AR 50.)

When accounting for the potential disruptions Pen's mental impairments might cause, Beeman said that if Pen were late or tardy more than two times, then she would not be employable. (AR 50.) Beeman also testified that an employee, who was off task because of mental impairments up to twenty percent of the time, or 45 minutes in an eight-hour day, would be unemployable. (AR 50.) Beeman equated being off task with a moderate impairment in concentration and persistence. (AR 51.) With unplanned interruptions or the need for breaks due to psychological symptoms or headaches, an employee would be unemployable if the need for breaks rises beyond two fifteen minute breaks in an eight-hour day. (AR 51.)

According to Beeman, an employee with a moderate impairment in the ability to interact appropriately with coworkers or supervisors, in addition to having linguistic barriers and being able to perform only simple, routine, and repetitive tasks, would be unemployable. (AR 51-52.) Thus, Beeman's testimony suggests that Pen is physically able to do her past work, but that she would be unemployable if her mental impairments caused her to be off task or if she needed additional breaks throughout the workday.

Case No. 12-cv-01041 NC
ORDER GRANTING REMAND                4

### 3. The ALJ's findings

On March 10, 2010, the ALJ found that Pen is not disabled by her mental illness. (AR 11-14.) The ALJ analyzed Pen's claims under the five-step evaluation process for determining disability. (AR 12-13.); *see* 20 C.F.R. § 416.920(a). At step three, the ALJ considered the evidence in the record of Pen's impairment or combination of impairments and found that the evidence of Pen's mental impairments do not satisfy the "paragraph B" criteria, used to rate the severity of mental impairments. (AR 14.) Finding that Pen is not disabled at step three, the ALJ assessed her residual functional capacity. He determined that Pen has the residual functional capacity to perform a full range of work at all exertional levels but that her ability is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions with few work place changes. (AR 14.)

In reaching this conclusion, the ALJ found that Pen's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (AR 15.) The ALJ found that the medical evidence "does not support a complete inability to work for 12 consecutive months" based primarily on six factors: (1) Pen's alcohol consumption when she was involuntarily hospitalized discredits her testimony in April 2007; (2) Pen's symptoms improved for two months after February 2008; (3) Pen's symptoms appear to wax and wane, and she did not seek treatment for a period of nine months; (4) Pen's alleged limitations are not supported by her actual level of activity or treatment history; (5) the statements by Drs. Champlin and Afary were not consistent with the record as a whole and thus given little weight; and (6) the conclusion by Dr. Lucila that Pen could execute daily living activities and perform simple work. (AR 16-18.)

### C. The Appeals Council's Denial of Review

Pen appealed the ALJ's decision to the Appeals Council on May 14, 2010, arguing that (1) the ALJ failed to award proper weight to the opinions of her treating doctors,

treating therapist, and the medical consultant, and (2) that the ALJ improperly found Pen's statements not credible. (AR 7, 222-226.) The Appeals Council denied the request for review on December 27, 2011, finding "no reason" to review the ALJ's decision. (AR 1-6.)

**D. Jurisdiction**

The parties have consented to the jurisdiction of a United States magistrate judge under 28 U.S.C. § 636(c). Dkt. Nos. 22, 24.

## II. STANDARD OF REVIEW

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). "When the Appeals Council denies a request for review, . . . the ALJ's decision becomes the final decision of the Commissioner." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). The decision of the Commissioner should only be disturbed if it is not supported by substantial evidence or it is based on legal error. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation and quotation omitted). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (internal citation and quotation marks omitted). It is evidence that a reasonable mind would accept as adequate to support the conclusion. *Id.* "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal citation and quotation omitted). Furthermore, a decision by the ALJ will not be reversed for errors that are harmless. *Burch*, 400 F.3d at 679.

When reviewing the ALJ's weighing of medical evidence, additional standards apply. *Id.*; 20 C.F.R. § 416.927. If a claimant has a treatment relationship with a provider, and that provider's opinion is supported by clinical evidence and not inconsistent with the record, the provider will be given controlling weight. 20 C.F.R. § 416.927(c)(2). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427

F.3d 1211, 1216 (9th Cir. 2005) (internal citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* Furthermore, if the treating physician's opinion is conclusory, brief, and unsupported by clinical findings, and ALJ need not accept it in light of conflicting opinions. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Generally, "the opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician." *Ryan*, 528 F.3d at 1198.

### III. DISCUSSION

Pen contests the ALJ's finding and argues: (1) that the ALJ failed to give the proper weight to the treating physicians' opinions and improperly relied on the opinion of a non-treating physician; (2) that the ALJ did not provide clear and convincing reasons for rejecting Pen's complaints; and (3) that the residual functional capacity assessment was not supported by substantial evidence. *See* Pl.'s Mot. Summary Judg., Dkt. No. 17.

**A. The ALJ Committed Legal Error in Weighing the Medical Evidence.**

Pen contends that the ALJ improperly rejected the opinions of her treating physicians, Drs. Champlin and Afary, and instead relied on the opinion of Dr. Lucila, a non-treating medical consultant. Pl.'s Mot. Sum. Judg. at 9. Although Pen also saw doctors from the Shuman Liles Clinic and the Sausal Creek Clinic, the ALJ does not specifically address these medical records in his decision.

The Ninth Circuit and Social Security regulations distinguish among three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995); 20 C.F.R. § 416.927(d)(2). The ALJ may reject the opinion of a treating source whose opinion is contradicted by other medical evidence by providing specific and legitimate reasons that are supported by substantial evidence. 20 C.F.R. §§ 416.912, 416.927. An ALJ properly cites specific, legitimate reasons for rejecting a medical opinion

"by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

### 1. Dr. Afary

Mona Afary, Ph.D., MFT, is the clinical director of the Center for Empowering Refugees and Immigrants. (AR 387.) Dr. Afary treated Pen from January 25, 2010 to February 11, 2010 and diagnosed her with posttraumatic stress disorder and major depression with psychotic features. (AR 387, 389.) In her assessment, Dr. Afary concluded that Pen cannot adapt to work or work-like situations. (AR 389.) She also noted that Pen's prognosis was fair to poor and that Pen "needs to take her meds indefinitely to avoid auditory and visual hallucinations." (AR 389.) A treating physician's opinion on disability is weighed exactly as his medical opinion. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

The ALJ rejected Dr. Afary's assessment because her "statement is not supported by the record as a whole; she has had only a brief treating relationship with the Claimant; her opinion is inconsistent with the Claimant's actual level of activities; and it is in stark contrast to other treatment notes indicating the Claimant reported she was doing well just 3 weeks earlier." (AR 17.)

#### a. Support in the record as a whole

The record as a whole supports Dr. Afary's diagnosis of posttraumatic stress disorder and major depression with psychotic features because Pen was diagnosed with these mental health problems multiple times. In October 2005, Steven Gluck, M.D., of Sausal Creek Clinic diagnosed Pen with psychosis and found that she suffered from paranoia and hallucinations. (AR 430.) In April 2007, Dr. Champlin diagnosed Pen with major depressive disorder with psychotic features and alcohol dependence. (AR 230.) In February 2008, Uma Thirugnanasampanthan, M.D., at the Shuman Liles Clinic diagnosed Pen with psychosis and PTSD, and noted that Pen had a depressed and anxious mood, a flat affect, and that her thoughts were delusional and paranoid. (AR 314-319.) And, Maria

Kerosky, Ph.D., concluded that Pen suffered from major depressive disorder with psychotic features, after reviewing Pen's medical record. (AR 337.) Additionally, Pen's complaints of anxiety, depression, and nightmares are consistent with the complaints she made to doctors beginning in 2005. (AR 308-319, 408-423, 427.)

Although the record indicates that Pen was doing well on her January 14, 2010 visit to the Shuman Liles Clinic, (AR 398), just three weeks before she saw Dr. Afary, the evidence supports, and the ALJ concluded, that Pen's "symptoms appeared to wax and wane." (AR 16.) Dr. Afary's assessment is not in "stark contrast" with other evidence in the record, which indicates that the severity of Pen's symptoms fluctuates. That the Shuman Liles Clinic notes from January 2010 are inconsistent with Dr. Afary's assessment a few weeks later, without more, is not a sufficient basis for discrediting Dr. Afary's conclusion. "Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *Lester*, 81 F.3d at 833. Particularly here, where substantial evidence supports Dr. Afary's diagnosis, Dr. Afary's assessment may not be discredited on the basis that Pen was doing well at a prior meeting.

Regarding Pen's ability to work, Drs. Afary, Champlin, and Lucila each made conclusions about what impact Pen's mental health problems would have on her ability to work. (AR 17.) In addition, records from the Sausal Creek Clinic indicate that doctors there noted that Pen's anxiety interferes more than "some with daily life." (AR 427.)

Generally, "the opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician." *Ryan*, 528 F.3d at 1198. As noted above, both Dr. Champlin and Dr. Afary treated Pen. Dr. Lucila, whose opinion the ALJ relied upon in finding Pen not disabled, is a non-treating and non-examining physician. He reviewed the record evidence and concluded that Pen has moderate "to marked abilities to withstand the stress of a routine work day." (AR 354.) In his section on the "weighing of opinion evidence," Dr. Lucila notes that he is "torn between an assessment of simple work tasks with very limited public contact or an inability to perform the same." (AR 355.) Dr. Lucila then states in his "Recommendations" that Pen "should be able to perform simple work."

(AR 355.) Dr. Afary's conclusion in 2010 that Pen cannot adapt to work is consistent with Dr. Lucila's first two observations, but at odds with Dr. Lucila's ultimate opinion. Dr. Afary, however, is a treating physician, and her opinion is entitled to greater weight than Dr. Lucila's. Because the record as a whole supports Dr. Afary's conclusions that Pen suffers from mental health problems that have an impact on her ability to work, the ALJ should not have rejected her opinion in favor of the opinion of a non-treating physician.

### b. Level of activity

Dr. Afary's assessment of the impact of Pen's mental illnesses on her level of activity is consistent with the record as a whole. She notes that Pen "takes care of the basic stuff," but that Pen's sister helps her with driving and other tasks. (AR 388.) On her disability appeal, Pen writes that she cooks for her children and gets them ready for school. (AR 173.) The ALJ specifically notes that Pen reported to Dr. Kerosky in 2008, a consultative examiner, that "she was independent with activities of daily living" but "denied being able to drive or use public transportation." (AR 16.) Dr. Afary's assessment of Pen's level of activity is consistent with the other evidence of Pen's daily activities in the record, namely, Pen's report to Dr. Kerosky.

### c. Length of treatment time

The record indicates that Dr. Afary treated Pen for two weeks, which the ALJ found was a reason to reject Dr. Afary's opinion. (AR 387, 17.) There is no magic number of visits required to establish a treatment relationship; "[r]ather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1038 (9th Cir. 2003). For example, in *Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir. 1994), the Ninth Circuit held that a physician who has seen a patient only twice in a fourteen month period is entitled to deference as a treating physician. The Ninth Circuit noted that the doctor in *Ghokassian* prescribed medication for the claimant, referred to him as "my patient," and, importantly, had the most extensive contact with the claimant. *Id.* Similarly, here, Dr. Afary has prescribed medication for Pen, and no

other physician has had contact with her for a longer period. In fact, the ALJ found that Dr. Champlin, who also saw Pen for a two-week period, was a treating physician. Thus, Dr. Afary's two-week treating relationship with Pen is sufficient to accord her opinion the weight given to treating physicians. *Id.* at 1304. The ALJ committed legal error by improperly categorizing Dr. Afary's opinion and failing to weigh it accordingly. *Id.*

### 2. Dr. Champlin

John Champlin, M.D. in Psychiatry, treated Pen in 2007 during Pen's two-week involuntary hospitalization at the Alta Bates Medical Center. (AR 229-242.) Upon admission, Dr. Champlin diagnosed Pen with major depressive disorder with psychotic features and with alcohol dependence. (AR 229.) Upon discharge, Dr. Champlin opined that Pen was suffering the stress of a chronic mental illness. (AR 229-230.)

The ALJ provided a specific, legitimate reason for rejecting Dr. Champlin's conclusion that Pen suffered from chronic mental illness: "I give that opinion little weight because there is no evidence to show the Claimant had a 'chronic mental illness;' that is, there is no evidence of any ongoing mental impairment or treatment prior to April 2007." (AR 17.) This reason is not supported by substantial evidence, however. Although the ALJ asserts that there is no evidence of ongoing treatment prior to April 2007, medical records from the Sausal Creek Outpatient Stabilization Clinic show that in 2005, Pen was diagnosed with psychosis and alcohol abuse, given trial medication, and referred to a substance abuse program. (AR 430.) The psychiatrist who treated Pen at Sausal Creek, Dr.Gluck, notes that Pen's mood was anxious and her affect was constricted with thoughts of paranoia and hallucinations. (AR 430.) Her perception of distress or anxiety prior to coming to the Clinic was ranked a nine out of ten, indicating that her mental state interfered with her daily activities "some" to "a lot." (AR 427.) Additionally, the staff assessed that Pen suffered from "severe distress" and that she was "preoccupied with distress/anxiety," which was "very disrupting in life." (AR 427.) Pen went back to the Sausal Creek Clinic a few days later to report on the effectiveness of the medications she was prescribed, which indicates some continued treatment. (AR 435.)

Case No. 12-cv-01041 NC
ORDER GRANTING REMAND           11

The ALJ took issue with Dr. Champlin's diagnosis of "chronic" mental illness. (AR 229-230.) "Chronic" however, can mean "of long duration," "denoting disease of slow progress and long continuance," or "recurring." *See* Merriam-Webster Dictionary. Pen received mental treatment prior to 2007, and her diagnoses as well as her symptoms were the same as those reported by Dr. Champlin in 2007. The evidence therefore indicates that Pen's illness at least recurred, if it had not lasted the entire duration. Thus, while there may not be evidence of ongoing treatment prior to 2007, as the record only indicates Pen's two visits to Sausal Creek, the continuity of her diagnoses indicates that in 2005 she was suffering from the same mental impairments. The fact that Pen has been diagnosed multiple times with depression, anxiety, PTSD, and paranoia shows that her impairments are "ongoing."

### 3. Dr. Kerosky and Dr. Lucila

Maria Kerosky, Ph.D., is a non-treating, consultative examiner who met with Pen in 2008. (AR 333-38.) Dr. Kerosky examined Pen for the purpose of assisting disability determination, but did not treat her, and thus her opinion is entitled to less weight than a treating source, but more weight than a non-treating and non-examining source. 20 C.F.R. § 416.927(c).

Danilo V. Lucila, M.D., is a non-examining, non-treating physician who based his conclusions on a review of the evidence in the record in 2008. (AR 339-52.) Dr. Lucila reviewed the record, but did not examine Pen, and therefore his opinion is entitled to less weight than an examining medical source or treating source. 20 C.F.R. § 416.927(c). Consultative physicians and medical experts may serve as substantial evidence, however. *Magallanes*, 881 F.2d at 752. Their opinions are evaluated under the same factors (the nature and extent of relationship with the claimant, the extent to which objective medical evidence supports the opinion, the extent to which the opinion is consistent with the record, and the area of expertise of medical source) used to assess other medical opinions. 20 C.F.R. § 416.927(e)(2)(iii); *see* 20 C.F.R. § 416.627(c)(1)-(6).

//

Because Dr. Kerosky and Dr. Lucila gave their opinions in 2008, they did not have the opportunity to review Dr. Afary's medical opinion from February 2010 in reaching their conclusions.

Dr. Kerosky's diagnostic impression was major depressive disorder with psychotic features. (AR 16.) Additionally, she found that Pen had "moderate limitations in following complex/detailed instructions, moderate to marked impairment in maintaining adequate pace and persistence to perform complex tasks, moderate limitation in her ability to adapt to changes in job routine, moderate to marked limitations in withstanding the stress of a routine workday or maintaining emotional stability/predictability . . . ." (AR 17.)

As mentioned above, Dr. Lucila's conclusions regarding the severity of Pen's limitations within his own report are somewhat conflicting and indicate that Pen's mental health is on the border of completely precluding her from working. (AR 354-355.) He also found that Pen had "moderate limitations in maintaining concentration and attention for extended periods and completing a normal workday or workweek." (AR 17.)

Thus, the ALJ's reliance on Dr. Kerosky's and Dr. Lucila's opinions to support the conclusion that Pen can perform simple work is not entirely supported by the doctor's own findings. Their opinions provide more than a scintilla of support for the ALJ's conclusion that Pen's mental health issues are not disabling, however.

Nevertheless, the ALJ committed legal error in failing to defer to Dr. Afary's opinion as a treating physician. Even with the support the ALJ's conclusion finds in Dr. Lucila's and Dr. Kerosky's equivocal opinions, more evidence in the record supports Dr. Afary's assessment of Pen's impairments. Substantial evidence must support an ALJ's specific and legitimate reasons for rejecting the opinion of a treating physician for that of a non-treating physician, and here it does not. Legal error is grounds for reversal.

**B.  The ALJ Improperly Discredited Pen's Testimony.**

The ALJ concluded that Pen's statements regarding the severity of her impairments were not credible because he found that (1) the evidence provided about her 2007 hospitalization was not credible because Pen had been drinking prior to admission, and she

denied taking any medications, (2) the treatment records do not support a complete inability to work, and (3) Pen's limitations are not supported by her actual level of activity.

"Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.' 'General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" *Reddick*, 157 F.3d at 722 (citing *Lester*, 81 F.3d at 834). Because the ALJ did not make findings that the claimant is malingering, the Court considers whether the ALJ gave the "clear and convincing" reasons for discrediting Pen's testimony.

### 1. Pen's hospitalization in 2007

Under 42 U.S.C. § 423(d)(2)(C), a claimant cannot receive disability benefits "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *See Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Here, as the ALJ noted, Pen was diagnosed at her 2007 hospital admission with alcohol abuse and major depressive disorder with psychosis. (AR 15.) The ALJ suggests that Pen's testimony regarding the severity of her impairment is not credible because she "admitted she had been drinking a lot prior to that hospitalization, and she was placed on an alcohol withdrawal protocol upon admission." (AR 15.)

The ALJ does not refer to Pen's drinking as a contributing factor in Pen's disability determination, but only as a reason for discrediting the severity of her symptoms. But, the complaints she made during her 2007 hospital admission of hearing voices and depression are consistent with her 2005 medical records. (AR 427.) Moreover, upon Pen's discharge from the hospital thirteen days later, Dr. Champlin again diagnosed Pen's major depression with psychotic features. (AR 230.) By that time, she had been placed on an alcohol withdrawal protocol. (AR 229.) Thus, her alcohol intake when she was admitted to the hospital in 2007 is not a convincing reason to discredit Pen's testimony regarding the severity of her psychosis, which has been corroborated by diagnoses that are independent of her alcohol intake.

Case No. 12-cv-01041 NC
ORDER GRANTING REMAND 14

In discrediting Pen, the ALJ also relies on Pen's denial of taking any medication upon her admission to the hospital in 2007. (AR 15.) The toxicology test indicated that Pen had taken benzodiazepines and antidepressants. (AR 229.) Other doctors similarly noted confusion about when Pen had taken medication and which prescriptions she was using. For example, Dr. Balt, a medical doctor at the Shuman Liles Clinic, noted on November 20, 2009 that Pen reported she was still taking medication, but that her last prescription was given in February for only one refill. (AR 402.) The pharmacy reported that her last refill was in April, and Dr. Balt noted that Pen is thus "noncompliant" with her medication. (AR 402.) Pen's inconsistency in reporting her medications is a clear and convincing reason to discount her credibility, and it is supported by the record.

**2.    The ALJ improperly relied on the opinion of Dr. Lucila.**

The ALJ determined that the treatment records do not indicate that Pen is completely unable to work. The ALJ's assertion that the treatment records do not indicate a complete inability to work is substantiated by Dr. Lucila's opinion; however, other evidence in the record conflicts with this opinion. As discussed above, Drs. Lucila, Afary, and Champlin specifically opined on plaintiff's ability to work and came to different conclusions. The treatment records indicate that Pen's symptoms appeared to fluctuate, however, and every doctor found at least a moderate limitation in Pen's ability to concentrate. Even the ALJ concluded as much. (AR 14, 16.) As a treating physician whose opinion is supported by the record, Dr. Afary's conclusion that Pen is completely unable to work is entitled to greater weight than Dr. Lucila's opinion that Pen could perform simple work. *Ryan*, 528 F.3d at 1198.

In addition, the vocational expert, Beeman, indicated that an employee who was off task because of mental impairments up to twenty percent of the time or forty-five minutes in an eight hour day would be not employable. (AR 50.) Beeman equated being off-task with a moderate impairment in concentration and persistence. (AR 51.) The ALJ does not address why Pen's moderate impairment in concentration does not affect her ability to work. The ALJ does not provide clear and convincing reasons for rejecting the vocational

expert's opinions on Pen's employability or Dr. Afary's, particularly in light of the ALJ's own finding that Pen has a moderate impairment in concentration.

### 3. Pen's activity is limited to household chores.

"The mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." *Benecke v. Barnhart*, 379 F.3d 587, 593-94 (9th Cir. 2004). "[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722. "Many home activities are not easily transferable to . . . the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Here, the ALJ determined from Pen's statements that she is able to care for her children, drive, and shop, that she is, therefore, more active than she claims. (AR 17.) The record is unclear, however, exactly which tasks Pen performs herself and which her sister assists her with. For example, on the disability report appeal, Pen writes that she cooks for her children and gets them ready for school. (AR 173.) But, in the same appeal, she writes that now her sister has to prepare meals. (AR 174.) Pen has also stated that her sister has to help with all her personal care. (AR 206.) Many of the doctors' records indicate that Pen's sister was with her or speaking on her behalf at the meetings, which could account for some of the confusion. For example, when Pen met with V. Nguyen, a social security case interviewer, on May 17, 2007, she did not speak during the meeting, and her sister supplied information to the interviewer. (AR 170.) Regardless of these discrepancies, the ALJ never alleges, and the record does not support, the notion that Pen claimed to actually engage in activity beyond home activities. Thus, the ALJ was incorrect in concluding that this is evidence of her ability to work outside of the home when the demands of a workplace environment do not afford the same opportunities for breaks, rest, or assistance.

Pen's inconsistent statements about and use of her medication provides a valid reason for discrediting her testimony. Comparing those inconsistencies with the significant

//

amount of evidence in the record that corroborates the symptoms Pen described, however, the Court concludes that the ALJ erred when he discredited the entirety of Pen's testimony.

## C. Substantial Evidence Does Not Support the ALJ's Assessment of Pen's Residual Functional Capacity.

The ALJ concluded that Pen "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine and repetitive tasks in a work environment free of fast paced production requirements, involved in only simple work-related decisions with few, if any, workplaces changes." (AR 14.)

"A claimant's residual functional capacity (RFC) is the most a claimant can still do despite her limitations, and is based on all the relevant evidence in the case record, not on the findings of a particular doctor." *See* 20 C.F.R. § 404.1545(a). The ALJ based his conclusion that Pen was capable of doing simple, routine tasks from Dr. Lucila's evaluation. (AR 18.) The ALJ stated that Pen's "treatment records, actual level of activity, and testimony fail to support a more restrictive residual functional capacity." (AR 18.)

The reasons listed by the ALJ are not supported by substantial evidence in the record, and the ALJ improperly relied on Dr. Lucila's evaluation as the justification for his assessment of Pen's residual functional capacity. As discussed above, Dr. Lucila's opinion as a non-treating, non-examining physician is entitled to less weight than the opinions of Pen's treating physicians. The opinions of Dr. Champlin, Dr. Afary, and the doctors at the Sausal Creek Clinic should have been accorded more weight. Their treatment records and opinions establish that Pen's ability to work is affected by her mental disorder to a greater degree than the ALJ's assessment of her RFC accounts for. As discussed, Pen's actual level of activity demonstrated in the record is limited to household tasks, and these do not indicate that Pen can perform a full day of work. Beeman's testimony indicates that Pen would be unemployable if she was had a moderate impairment in her concentration, a fact that is well established in the record. (AR 51.) Although the ALJ is not required to accept the testimony of the vocational expert, Beeman's testimony only further corroborates the

evidence in the record that Pen is unable to work either due to the severity of her impairments or because she would be unemployable.

### D. Remand

District courts have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g). The district court should credit evidence that was rejected during the administrative process if the ALJ failed to provide legally sufficient reasons for rejecting the evidence. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). The necessity for further proceedings is evaluated under the general rule that remand is appropriate if enhancement of the record would be useful. *Id.*

Here, the ALJ committed legal error in failing to accord appropriate weight to the opinion of Dr. Afary, a treating physician, and relied too heavily upon the opinion of Dr. Lucila, a non-examining consultant, in assessing Pen's residual functional capacity. The Court could, on this record, reverse. Nevertheless, given the sparseness of the record, the inconsistencies in some of Pen's testimony, and the confusion over whether her sister was speaking on behalf of Pen, or on her own behalf, the Court determines that enhancement of this record would be useful. Remand for further proceedings will allow Pen to submit additional evidence of her illness, which could clarify Dr. Champlin's definition of chronic and better establish the extent to which Pen's symptoms interfere with her ability to work. Accordingly, the Court remands for the ALJ (1) to accord the proper weight to Dr. Afary as a treating physician and (2) to consider any additional evidence that the parties may submit that would document the impact of Pen's mental health issues on her ability to work. Of particular relevance may be any records that might substantiate whether Pen was treated by Dr. Afary in 2008 as well as in 2010.

//

## IV. CONCLUSION

Because the ALJ committed legal error in failing to accord the proper deference to the opinion of a treating physician, and because the evidence in the record supports that Pen's mental illness prevents her from being gainfully employed, the Court reverses the decision of the ALJ and remands for the Commissioner to give greater weight to Pen's treating physicians and to engage in further fact finding to assess the chronic nature of Pen's mental impairments in order to determine whether she may perform jobs existing in significant numbers in the national economy.

IT IS SO ORDERED.

Date: August 2, 2013

_____
Nathanael M. Cousins
United States Magistrate Judge